# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORANGE TRANSPORTATION SERVICES, INC., | Case No. _____ |
| Plaintiff, | |
| vs. | **ORIGINAL COMPLAINT** |
| VOLVO GROUP NORTH AMERICA, LLC | |
| Defendant. | **JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT

Plaintiff Orange Transportation Services, Inc., ("Plaintiff" or "OTSI"), brings this action against Defendant Volvo Group North America, LLC, ("Defendant" or "Volvo"), and alleges as follows:

## I.   INTRODUCTION

1.      The 2016 Volvo D13 engine has common defects (the "Engine Defects") leading to repeated breakdowns and malfunctions. The nature of the defects is such that Volvo dealerships are unable to adequately repair them in a timely manner, leading to significant lost income caused by Plaintiff having to bring its trucks in for multiple repair attempts and its trucks being unavailable and/or inoperable for extended periods of time, as well as excessive repair expenses once the warranty on the trucks has expired.

2.      This action arises from Defendant's failure, despite its longstanding knowledge of a material design defect, to disclose to Plaintiff that the 2016 Volvo D13 engines contain defects and Defendant's inability or refusal to properly repair the engines.

3.      The Engine Defect has caused and will inevitably continue to cause extensive damage to Plaintiff as alleged herein.

4.      Significantly, the Engine Defect poses a safety risk to the operator of the vehicle since the engine malfunctions can be sudden and cause accidents on the road.

5.      Not only did Volvo actively conceal the Engine Defect, but Volvo did not reveal that the existence of the Engine Defect would diminish the intrinsic and resale value of the trucks.

6.      Volvo has long been well aware of the Engine Defect as evidenced by the numerous complaints that have been made to Volvo by Plaintiff and other drivers of vehicles with the defective engine.

7.      Notwithstanding its longstanding knowledge of this design defect, Volvo has (a) refused to repair the Plaintiff's truck engines without charge when the Engine Defect manifests, (b) repaired the Plaintiff's trucks inadequately resulting in future malfunctions, and (c) taken an unreasonably long time to attempt to repair the Plaintiff's trucks resulting in substantial lost income resulting from inoperable trucks.

## II.     JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332(a) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

9.      Plaintiff is a South Carolina corporation with its principal place of business located in the State of New York, County of Monroe.

10.     Upon information and belief, Defendant is a Delaware Corporation, with its principal place of business located in the State of North Carolina, County of Guilford.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district. Additionally, Defendant has advertised in this district and has received substantial revenue and profits from its dealerships' sales and/or leasing of trucks in this district; and Plaintiff purchased some of the vehicles in this district. Additionally, Defendant's representatives frequently met with Plaintiff's representatives in this district to negotiate sales terms and make representations regarding the trucks at issue; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

12.     This Court has personal jurisdiction over Defendant because Volvo Group North America, LLC is a corporation duly organized and existing under the laws of the State of Delaware, and is registered to do business in New York, with registered agent for service in New York, CT Corporation System, 111 Eighth Ave., New York, NY 10011.

13.     Defendant has conducted substantial business in this judicial district, and intentionally and purposefully placed trucks into the stream of commerce within this district and throughout the United States.

### III.    THE PARTIES

A.    **The Plaintiff**

14.     Plaintiff, Orange Transportation Services, Inc., ("OTSI"), is South Carolina corporation with its principal place of business in Monroe County, New York.

B.    **The Defendant**

15.     Defendant is a corporation duly organized and existing under the laws of the State of Delaware, and is registered to do business in New York. Its registered agent for service in New York is:  CT Corporation System, 111 Eighth Ave., New York, NY 10011.

## IV.   TOLLING OF STATUTES OF LIMITATION

16.     Any applicable statute(s) of limitations has been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff could not have reasonably discovered the true, latent defective nature of the Engine Defect until shortly before this litigation was commenced.

17.     Defendant was and remains under a continuing duty to disclose to Plaintiff the true character, quality and nature of the trucks, that this defect is present in all the trucks, that the defect will require costly repairs, poses a safety concern, and diminishes the resale value of the trucks, and that Volvo dealerships are unable to properly and timely repair the defect. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## V.   FACTUAL ALLEGATIONS

### A.   The 2016 D13 Engines

18.     In 1996 Volvo trucks North America, Inc. was created to manufacture, market, and sell trucks in the United States.

19.     In 2000 Volvo acquired Renault and Mack trucks, becoming the second largest Class 8 truck maker in North America. Since then it has grown to be the largest.

20.     In November 2002 Volvo began producing Volvo engines in conjunction with the EPA's new emission regulations.

21.     In 2005, Volvo introduced the Volvo D13 engines.

22.     In 2007, Volvo introduced the D13 engine with an Exhaust Gas Recirculation ("EGR") configuration and Variable Geometry Turbo ("VGT") turbocharger.

23.     Volvo touted its D13 engine as a "very fuel-efficient, powerful and lightweight engine, designed to meet current and future EPA regulations while improving reliability and

lowering operating costs." Volvo represented that "[t]he engine provides impressive performance with excellent low-end torque for improved drivability. The new variable geometry turbo also makes the engine very responsive while improving fuel economy." *Id.* Volvo stated that the D13 engine was "the perfect choice for line haul, regional and vocational operations" and "delivers a reliable, cost-effective and powerful solution—in a light, high-performance package—for a wide variety of applications." *Id.*

24.     Volvo experienced serious problems with its D13 engines. Each time it developed a new version of the D13 engine, it claimed that it had resolved the problems. However the 2015 D13 engine is plagued with the same and similar problems found in earlier versions.

25.     Volvo manufactures the engines at issue in this litigation in Hagerstown, Maryland, and manufactures the trucks in Dublin, Virginia.

26.     The Engine Defect present in the Volvo D13 engines impact and originate in its EGR system, turbochargers, injectors and other related components, leading to repeated and serious malfunctions.

27.     The Engine Defect has caused and will inevitably continue to cause extensive damage to Plaintiff, including safety issues caused by the unexpected malfunctions and breakdowns of the engines while the vehicles are operating at high speeds throughout the country.

## VI.     PLAINTIFF'S EXPERIENCES WITH THE ENGINES

28.     Plaintiff purchased more than twenty Volvo trucks with the Engine Defect.

29.     Due to the Engine Defects, Plaintiff experienced repeated malfunctions including transmission problems; air leaks; coolant leaks; turbocharger; ECV; injectors; and exhaust leaks.

30.     Due to the repeated malfunctions and the inability of Volvo dealerships to repair them in a proper and timely manner, Plaintiff experienced excessive down time and resulting lost revenue while its trucks were out of service and unable to be used for their intended purpose.

31.     Plaintiff's experiences are by no means isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same problems with Volvo trucks with these D13 engines.

32.     In 2014, Orange Transportation Services, Inc. ("OTSI") was seeking to purchase a new fleet of trucks. OTSI Vice-President, Tony Kirik, contacted Mr. Ken Nye at Buffalo Truck Center, Inc. ("BTC").  After several meetings with Mr. Nye at OTSI's office, Mr. Nye brought in BTC's owner, Tom Kurg. Kirik was skeptical about purchasing Volvo trucks with D13 engines due to his understanding that these engines frequently experienced injector failures and had less power than Cummins ISX engines.

33.     Mrs. Christina Ameigh, regional fleet sales manager of Volvo trucks, was invited to Kirik's next meeting with BTC. Mrs. Ameigh worked for Cummins before joining Volvo trucks. Mrs. Ameigh explained that Volvo's D13 engine had been performing very well for Volvo's fleet customers. Kirik explained that OTSI's trucks operate coast-to-coast, including in areas with steep hills. Mrs. Ameigh encouraged Kirik to use Volvo's resources in establishing the specification for the trucks to be purchased by OTSI and invited Kirik to tour Volvo trucks' factory in Dublin, Virginia, and its Uptime Center in Greensboro, S. Carolina. In September 2014, Kirik toured the factory where the trucks are assembled, then toured the Uptime Center where Volvo provides customer service. Kirik then met with the engineering team to discuss OTSI's specifications for its fleet. Joining Kirik was Ken Nye, Christina Ameigh, Tom Krug, Jason Spence (Volvo trucks' long haul marketing product manager), James Beichner (Volvo trucks' District Sales Manager) and a few of Volvo trucks' engineers.

34.     During the meeting, Kirik expressed concerns about issues with Volvo trucks' prior model-year D16 and D13 engines, especially the injectors and injector harnesses. Kirik raised concerns over the power of the D13 engines, explaining that OTSI hauls 45,000-pound loads cross-country. Nye and Ameigh verified that the D13 engines could meet OTSI's requirements. Volvo trucks' engineers talked about many of the improvements that Volvo is working on and implementing, being leaders in innovation.

35.     On 10/09/2014 Nye and Krug visited OTSI's office and secured an order for twenty-four 2016 Volvo 670 trucks with D13 Engines and Volvo I-shift transmissions. The trucks were delivered in early 2015, with the last unit being delivered on 4/08/2015. During this time, OTSI notified Nye and Keith Miller by email when each truck was placed into service so Volvo trucks could register the warranty accordingly.

36.     OTSI started experiencing problems with the trucks immediately.

37.     OTSI experienced coolant loss on 2/10/2016 with unit 564, which was taken to Conway Trucks and Bus, in Rochester, NY where mechanics tightened the hose clamp.   On 2/26/2016 unit 4060 arrived to Bruckner's in Oklahoma City, OK with injector cup problems and an injector was replaced. Repair was covered under warranty as the truck only had 51,000 miles. Unit 564 went back to Conway on 3/30/2016 for losing coolant again. Conway's mechanic determined an EGR cooler O-ring was loose, lower radiator hose was once leaking but not currently. He found pressure relief cap popping at 17.25 PSI, replaced the cap retested it, and it was popping at 19.2 PSI. The pressure was causing coolant to overflow from the expansion reservoir and the truck was brought to Buffalo Truck Center on 4/21/2016. Upon further inspection, all 6 injector cups were replaced. BTC's mechanic noted on the repair invoice that injector cups had very little sealant and "Did not feel as if they were wedged into the head properly." New cups with proper sealant and tool were installed. Kirik called Keith Miller at

BTC after the repair, trying to figure out what was causing these failures as several other trucks started to experience the same issues. Keith explained that Volvo came out with a new tool to install these injector cups, which should fix the issue. Kirik explained to Keith that OTSI was having more trucks experiencing these similar issues, including loss of pressure and coolant, as the warmer weather approached. Keith advised Kirik to bring the units to Volvo for inspection and repair.

38.    On June 24, 2016 Kirik emailed Ken Nye, Keith Miller and Christina Ameigh regarding Conway not having the capability to begin repairing OTSI's truck, which had been in Conway's shop for 8 days.  Mrs. Ameigh advised Kirik to follow up with the dealer and to call 800–52VOLVO. Mrs. Ameigh also requested the VIN# of the truck at Conway. Kirik replied that the 800-52VOLVO call center has no impact on repairs being made at dealerships.

39.    Kirik called Ken Nye and requested a meeting to discuss a permanent repair solution for the engine issues OTSI had been having. On 8/26/2016 a meeting was held in OTSI's office with Ken Nye.  Kirik provided Nye with a spreadsheet of all the trucks, detailing the individual repair history for each unit. Nye said he would pass the information to Glen Ziegler, Volvo's regional service representative.

40.    On 10/28/2016, Unit 570 was brought to TEC Equipment – Fontana, a Mack and Volvo heavy-duty truck dealership ("TEC") for engine misfiring. Kirik spoke to David Burgos, TEC's service advisor, explaining OTSI's repetitive issues with D13 engines. Burgos said that many Volvo Truck owners were experiencing the same issues as OTSI, and that Burgos had seen a substantial number of trucks being brought in for similar repairs, including injector cups, EGR coolers and injectors. Kirik asked what was causing these failures. Burgos said the heat in the pistons is causing stem valves to fracture, and that a new common rail fuel system is supposed to resolve this issue.  After OTSI authorized tear down, TEC found that the #5 exhaust valve had

broken and damaged the liner. Once an estimate was provided to Kirik, repairs were anticipated to be $22,000. Upon receiving the estimate, Kirik forwarded the estimate to Nye and Ameigh requesting assistance for coverage as the truck was at TEC of Fontana two months earlier and had the EGR cooler replaced. Ken Nye reached out to Glen Ziegler for assistance. Glen requested pictures from TEC and valve adjustment records from OTSI. Nye and Keith Miller decided to draft a list of trucks indicating which had injector cups replaced and bring them in for exhaust valve adjustment. Kirik emailed a list of most recent repair records and coordinated the trucks that had outstanding issues.

41.     On November 4, 2016, Unit 568 experienced coolant overflowing from reservoir tank due to pressure in the coolant system. After diagnostics, all 6 injectors were replaced with Volvo providing $1,200 of goodwill towards the repair bill. Kirik emailed Ken Nye asking why OTSI has to pay for these repairs, when the injectors are clearly defective and are failing on all OTSI's units.

42.     Kirik was concerned about the high repair costs resulting from the high number of injector cup failures and contacted Ken Nye to discuss ordering 20 new trucks for delivery in April 2017. Kirik specified that he wanted trucks with the new common rail fuel system, in order to avoid the issue with defective injector cups OTSI was experiencing in its current fleet. Kirik also explained that he wanted to trade in the defective units in his fleet. Unit 570 was still waiting for authorization for repairs when Keith Miller advised Kirik to authorize the repairs, promising that a Volvo representative would provide financial assistance once the truck was repaired. Mario Santos emailed Kirik stating that OTSI's Volvo representative would not provide assistance until OTSI provided valve adjustment records. Kirik emailed Ken Nye, Christina Ameigh and Keith pointing out that the two trucks presently at Buffalo Truck Center are having identical issues it's not a coincidence. On November 30th, 2017 OTSI paid a repair invoice

totaling $22,902.03 for Unit 570's repairs. On the same day as Kirik was paying 570's repair invoice, Ken Nye forwarded Tom Krug's email from a customer bragging about his fuel consumption with new engine Tom delivered. The customer claimed he was getting 8.4 miles per gallon on his first trip.

43.     Unit 4046 was towed to TEC requiring inspection for injector cups. Upon further review it was indicated by TEC's mechanics that injector cups failed and a knocking noise was coming from under the valve cover, and the cause of failure was: #5, #6 main caps, #5 and #6 main bearings. Volvo emailed Kirik that the engine was covered under warranty. This was the only engine repair that was covered for OTSI under warranty except for chassis parts.

44.     On June 30, 2017 Ken Nye emailed Kirik expressing his and Tom Krug's desire to meet regarding all of the engine problems OTSI had been experiencing. After the meeting, Ken emailed Kirik regarding the truck being repaired by TEC and asked Kirik to send him TEC's invoice. Volvo denied warranty coverage because the truck was 2 months past the 24-month warranty limit, despite the truck having only 180,000 miles and experiencing the same injector cup failure that was improperly repaired before. Later in the day Ken Nye emailed Kirik an invitation to register for an upcoming Volvo factory trip to introduce the next generation of Volvo trucks.

45.     A week later, on 7/12/2017, Volvo denied a warranty repair for Unit 4052 at Conway Truck & Bus warranty, claiming that the truck was 2 months past the warranty, even though the truck only had 247,000 miles. Kirik explained that Unit 4052 was placed into service on 1/27/2016, but Volvo recorded its in-service date as 3/06/2015, the date that the truck was delivered to OTSI's yard. Unit 4052 was misfiring with active codes for turbo, #6 cylinder and temperature sensors. The turbo fins showed something going through. After removing the head, Conway found the exhaust valve at #6 was broken and the liner was cracked. The total repair bill

was $16,154.57. Volvo contributed $6,500 as good-will policy. At the same time, Unit 6010 was at Conway Truck & Bus for combustion gases in the coolant. After inspection, Conway's technician found that all injector cups failed and 3 of 6 injectors needed replacing. Conway recommended replacing all 6 injectors, which OTSI authorized. The repair invoice was $4,366.55. Ken got Volvo to contribute $2,500 under its goodwill policy, per Glen Ziegler.

46.     On August 2, 2017, Kirik emailed Ken Nye regarding Unit 4058, which was being repaired at TEC. TEC determined that all injector cups failed, and replaced injectors 1, 2, and 3, and resealed and reinstalled injectors 4, 5, and 6. These repairs did not fix the engine and, after further diagnostics, TEC found that the EGR valve and cooler needed to be replaced. On 8/18/2017, OTSI paid $6,564.81 for Unit 4058's repairs. Kirik asked David Burgos (service advisor) what was causing these injector cups to repeatedly fail. Burgos said that Volvo updated the cups and the tool to install them, because the cups did not seal properly, with the sealant deteriorating over time. Burgos explained that the cup did not seal properly, resulting in failure of the cup, leading to coolant getting into the piston cavity.

47.     Kirik asked Burgos whether the injector spraying too much fuel would cause the piston chamber to operate at higher temperature, causing the sealant to deteriorate faster. Burgos conferred with Volvo mechanics and confirmed that when the injector over-sprays into the cylinder, the combustion temperature is much greater causing faster deterioration of the sealant around the injector cups, leading to coolant leaking into the piston cavity, which damages valves.

48.     On August 14th, 2017 Ken Nye and Christina Ameigh met with Kirik at OTSI office. Kirik prepared a spreadsheet outlining the substantially high failure rate of OTSI's Volvo D13 engines. Christina requested that Kirik email her the spreadsheet. Kirik did so, attaching OTSI's maintenance records. During the meeting Kirik emphasized that this defect is having a catastrophic financial effect on OTSI. All of OTSI's trucks were experiencing the same issues.

Many of the trucks that had injector cups replaced were experiencing EGR cooler failures not long after the injectors were replaced, and valves would fracture and break sending debris though the engine, damaging piston liner, turbo and other components.

49.     Christina Ameigh said the new common rail fuel system has fixed this problem and is performing very well. She said that she has fleet customers that are not having issues running the new engines. Ken Nye showed Kirik the new truck brochure, and explained to Kirik the specs and new features on the trucks. Kirik explained that OTSI was experiencing substantial losses and needed to get rid of these trucks as soon as possible. Christina agreed to explain the situation to Volvo and work on providing OTSI pricing on the next sale of trucks to offset the excessive repair costs incurred by OTSI as a result of the defects.

50.     Later that afternoon Kirik received an invitation from Christina Ameigh to the North America Commercial Vehicle (NACV) show in Atlanta, with a VIP pass. On August 16, 2017 Kirik emailed Cythina Alas at TEC to move forward with repairs on Unit 4058.

51.     On 9/14/2017 Ken Nye emailed Kirik stating that Tom Krug was working on a better package to offer to OTSI for trades, repairs, warranties, etc., and thanking Kirik for his patience.

52.     On 9/18/2017 Cynthia Alas emailed an estimate for unit 572 that arrived at TEC requiring replacement of all injector cups and injectors. Kirik forwarded the estimate to Ken and Christina labeled as "They don't stop," meaning the breakdowns are not slowing down. An hour later an updated quote from TEC was forwarded to Ken as well.  Ken stopped by the OTSI office on 9/20/2017 and explained that he's doing everything in his power to get some help with these repairs. Kirik mentioned that the malfunction frequency is increasing and that OTSI is losing customers due to trucks breaking down and resulting late deliveries. Kirik explained that the trucks are in repair shops for an extensive period and that that the attempted repairs are

ineffective, resulting in the trucks breaking down a short time later requiring additional repair attempts.

53.     While Ken was working with Volvo on a better trade resolution for OTSI, another truck broke down. On 10/27/2017 unit 568 was towed to Gateway Truck. It was determined that the #2 cylinder required replacement of rockers. Kirik emailed Ken and Tom the estimate, complaining that this same truck was at Conway for repairs just a week ago. Tom emailed Kirik that the truck was significantly out of warranty but reiterated that they were very aggressive on the new truck pricing as OTSI is considered an extremely important customer. Tom attempted to secure the new order of trucks offering to cover this invoice if OTSI would place an order. Tom advised Kirik to get these trucks off the road as soon as possible. A few days later Kirik emailed the invoice from Gateway to Tom and Ken. On 11/03/2017 OTSI paid the repair invoice to Gateway without having a response from Volvo. A few days later on 11/08/2017 Unit 4048 arrived to Shealy Truck Center of Duncan, SC for loss of coolant. Shealy determined that the injector cups failed, allowing combustion into the coolant system and that all injectors were loose. Kirik emailed Ken and Tom with another email labeled "They don't stop." Tom replied via email that he has requested that the regional vice president of Volvo attend Tom's next meeting with Kirik on November 15. The next day, Ken emailed that Chris Gossler would attend the meeting. A day prior to the meeting Kirik emailed Ken and Tom an updated spreadsheet with an additional $42,908.35 in repair expenses in the two months since the September meeting, not including the trucks that had just recently been taken in for repair.

54.     Tony Kirik, Paul Kirik, and Amanda Burgess, met with Tom Krug, Ken Nye, Christina Ameigh and Chris Gossler on November 15, 2017, at OTSI's office. Kirik emphasized that the high malfunction rate and Volvo's inability to properly repair the engines was a serious problem and provided a spreadsheet showing repair costs to OTSI totaling over $228,000. Many

of the trucks had fewer than 300,000 miles. The units that had repairs seemed to be failing again

within 100,000 miles after the repair. Kirik explained that the failures followed a pattern. At first

EGR coolers fail due to combustion in the coolant causing expansion tanks to crack, hoses to

leak, radiators to crack, then valves to fracture, which damaged the liners and the head. Kirik

expressed in the meeting Volvo knew of the problem at the time he purchased the trucks, as

evidenced by the fact that Volvo changed the design, introducing a new fuel rail system, a few

months after OTSI's purchase. Kirik also expressed concern about selling these trucks to friends

in the industry due to the fact that engines continued to fail, even after installing new injector

cups and/or injectors. Volvo's awareness of the defects was also evidenced by the low trade-in

offers for the 2016 trucks.

55.    Kirik explained that the formula he had been using for the past 17 years when

purchasing and trading in trucks no longer applied because of the known defects. Kirik also

noted that Volvo's competitors were offering a higher trade-in value for 2016 Volvo trucks than

Volvo offered. Chris Gossler expressed Volvo's value to OTSI and desire to make OTSI whole.

Tom Krug advised Kirik to get out from under these trucks as soon as possible. Christina

Ameigh talked about the new improved Volvo D13 engines that had been performing very well

with her other fleet customers. Ken then provided new pricing, which was about $8,500 more per

truck, far worse than OTSI expected. Kirik asked how OTSI can be guaranteed that these engines

aren't going to have the same issues.  Chris Gossler and Christina Ameigh reassured Kirik that

the engines are redesigned and have been performing very well. Kirik asked Volvo to

demonstrate its confidence in the engines by providing OTSI with a 500,000-mile full warranty.

Tom and Ken worked on the numbers and said the new trucks would cost $156,000 each. To

offset the repairs with Christina's and Chris's approval, Volvo said it would sell them for

$145,000 each. Kirik reiterated that Freightliner offered better pricing. OTSI was losing money

in the form of repair costs, towing charges, driver hotel lodging, re-powering the trailers, air transportation for deserted drivers, loss of revenue due to excessive downtime, insurance costs, and permit costs. Kirik explained that the timing of the introduction of the new engines demonstrated that Volvo was aware of the defects in these engines at the time Kirik bought them. Volvo's engineers had arrived at a solution to the engine defect at the time Kirik bought the trucks with the defective engines.

56.     Volvo was aware of the I-shifts failing as it has paid for Volvo dealerships to replace six in OTSI's fleet covered under warranty because customers were skeptical of the automatic transmission and refused to purchase them unless a 750,000 mile warranty was provided.  Kirik told Volvo that it needed to earn loyalty from its customers and compensate them for Volvo's knowing sale of defective D13 engines and failure to comply with their warranty obligations to repair them properly when they malfunctioned.

57.     The following day another truck, Unit 6000, broke down in Flagstaff, Arizona. Kirik emailed Volvo the repair history for the unit, including Conway replacing all injectors on 5/31/2017. The mechanic at Vanguard Truck Center in Flagstaff, Arizona performed a cylinder balance test on all cylinders and found #5 at 37% and #6 at 43%. He ran a compression test and found all to be within specifications. After the cylinder test, he found the #6 injector very loose with 2, 3, 4, and 5 loose as well. He recommended all injectors be replaced. OTSI approved the work order. Kevin Blacken also confirmed via email that on October 17, 2017 with 442,899 miles, injector cups were also replaced at Conway Truck and Bus. The truck was only driven 98,000 miles since all injectors were replaced and 17,460 miles since injector cups were replaced and valves adjusted.  Kirik assumed that this repair would be covered by warranty because malfunction occurred so soon after the prior repair.

58.     During the time Vanguard Truck Center was tearing into Unit 6000's engine, Unit 572 was in the shop at TEC, with replacement of 6 injectors, 6 injector cups and EGR cooler on 9/22/2017. Kirik emailed Ken Nye, Tom Krug, Chris Gossler and Christina Ameigh requesting an explanation for this failure. Tom responded that he instructed the district service manager to stay in contact with Volvo and for OTSI to hold tight until they have the information to make decision as they are redoing the quote at Tom's request. Per Tom, Vanguard agreed to provide OTSI with preferred pricing with support from Volvo.  Later that day, on December 6th, 2017, Glen Ziegler notified OTSI that Volvo agreed to provide $10,000 in goodwill money towards Unit 6000's engine repair. Vanguard's proposed premium overhaul was priced at $33,429.21, with a 36 month/350,000 mile warranty. Mr. Ziegler expressed that this was OTSI's best option and in order to receive the goodwill money, OTSI must have repairs performed by Vanguard. Kirik emailed Tom and Ken reemphasizing that the failure rate of these engines was causing substantial financial loss for OTSI, far exceeding the limited goodwill assistance offered by Volvo. The resale values are very low due to the defective engines. Kirik reiterated that OTSI has not ordered new trucks and that the denials on most of OTSI's requests for Volvo to cover the repairs are hurting Volvo's chances of getting OTSI's future business. Tom replied that he was able to get a discount on parts and labor and that OTSI's portion of the repair would be $24,000, and that if OTSI placed the new truck order for Volvo trucks, Chris Gossler would match that, making OTSI's cost $14,000. OTSI did not feel comfortable with taking that risk and shipped Unit 6002's engine with transmission intact.  On 01/15/2016 Unit 6000 was picked up from Vangaurd and the faulty engine picked up. At the same time, Unit 572 was dropped off for engine misfiring and shaking. Without having support from Volvo or Buffalo Truck Center, Kirik emailed pleading OTSI's case with David Orner at Vanguard because Unit 572 had 6 injectors and cups replaced at TEC only 53,706 miles ago (on 9/22/2017.) David emailed am

estimate to Kirik on 1/15/2018 for $10,816.97 which was forwarded to Tom by Kirik. Tom emailed David advising that he's been trying like a dog to sell OTSI new trucks and it's very difficult as OTSI had injector issues on 24 out of 25 units. After two weeks without any resolution, OTSI declined the repairs other than replacing the #6 injector. After installing the #6 injector, Unit 572 made it to Conway on 2/01/2018. Kirik requested pictures from Hope Imler, the service advisor at Conway. Hope later emailed oil report and pictures of the damaged valves and liner. On the same day, Unit 4048 was shut down in Idaho Falls, ID and had to be towed to Mountain West Truck Center in Idaho Falls, ID. Cody Gibson inspected the engine and found that the #6 cylinder liner cracked due to the valve stem dropping. Mountain West repaired the engine on February 12. Cody said the repair would not be covered under warranty per his warranty representative. Kirik contended that the repair should be covered under warranty because Shealy's Truck Center had recently replaced all 6 injectors and cups, and adjusted valves, on 11/15/2017 with 389,306 miles. Cody asked Kirik to email the repair invoice. Kirik emailed the invoice of Shealy's Truck Center's repairs and pictures of Unit 572 at Conway with identical issue, other than the liner not cracking. Cody emailed an invoice for $29,027.29 on 2/16/2017 and stated that he had a request to Volvo to cover part of the repair. Kirik advised Cody that OTSI was not provided with an estimate and never authorized or agreed to pay for the repair. OTSI will trade in the truck in 2 months with a trade value of $45,000 and it might not make sense to repair the engine. Kirik forwarded the repair invoice to Ken Nye and Tom Krug, voicing his concern again indicating that Unit 572 had identical engine failures. Neither Tom nor Ken replied to Kirik's email. On 2/21/2017 Cody emailed Kirik that he was able to get $7,000 from his DSM towards the invoice. OTSI paid the invoice and flew the driver to Idaho Falls to pick up the truck. While the driver was on board a plane heading to Idaho from North Carolina,

another truck (Unit 4058) broke down with the exact same issue on the side of the road. It was towed to Mountain West Truck Center in Heyburn, ID.

59.     On 2/22/2018 Kirik stopped at Conway to visit Don or Kevin to discuss the status on Unit 572 and both were out of the shop. Kirik asked Mike, Conway's service manager, for his opinion on the cause of these constant engine failures. Mike said that Conway had seen a large increase in engine failures and believed the cause was Volvo's new SCR (Selective Catalytic Reduction) system. Volvo introduced its SCR system with its 2010 trucks, as a way to meet 2010 EPA engine emission standards without forcing drivers to perform active regeneration procedures.  Volvo's theory was that using SCR to eliminate NOx from the exhaust after it flows through the diesel particulate filters (DPF) would enable Volvo to tune the engine for better fuel efficiency and performance. Mike stated that he thought the exhaust gases are recirculated causing the engine to work at higher temperatures which causes the sealant on the cups to deteriorate or injectors spraying too much fuel causing damage to the valves and other engine components.

60.     On March 5, 2018 Kirik emailed Ken Nye, Christina Ameigh, Tom Krug and Chris Gossler about Unit 4058 that was in Heyburn, ID explaining that it was showing the same type of engine failure as OTSI's other units. Kirik reiterated that since the beginning, OTSI has requested Volvo to explain the cause of these failures especially when other trucking companies are experiencing the same failures. Kirik explained that this unit had injector cups and 1, 2, and 3 injectors replaced and 4, 5, and 6 injectors reinstalled at TEC on 8/18/2017. Technician Joey Hill at Mountain West determined its #3 piston liner cracked due to exhaust valve dropping. Kirik emailed that in the last months, OTSI had 3 trucks experience identical issues and it seemed that the engines were failing more frequently; he included a repair estimate totaling $22,073.12. Joey Hill later advised that DSM would contribute $5,000 towards OTSI's repair cost, but needed

OTSI to approve the repairs. Later that afternoon, Kirik asked Joey how often he had seen this same type of engine malfunction in vehicles brought in for repair at his shop. Joey stated that he saw these engine failures a couple times per month. Kirik asked whether Volvo's new common rail fuel system corrected this problem. Joey said that in the 2 years since the common rail fuel system was implemented he had only seen 1 injector replaced on the newer engines. He said Volvo was using the same injector cups but implemented a new tool for replacing them.

61.     The following day, Kirik emailed Joey an invoice from a TEC 8/2/2017 repair of an engine with 298,325 miles, roughly 92k miles earlier, where injector cups and 1, 2, 3 injectors were replaced and 4, 5, 6 reinstalled with regulating the valves during the repair. A few hours later Joey Hill forwarded Mr. Ziegler's reply, claiming that those injectors replaced 92k miles ago were unrelated to this failure. Mr. Ziegler claimed that Kirik's theory of overfueling causing the valve to deteriorate and fail is unproven internet chatter. He stated that his offer of $5,000 goodwill stands and there will be no additional money related to this failure. Kirik authorized Mr. Hill to proceed with repairs and pointed out that OTSI's experience of 20 out of 23 trucks experiencing similar engine malfunctions is indicative of a serious defect.

62.     Kirik's investigation of this matter has included reviewing numerous repair invoices and speaking with many Volvo mechanics who have worked extensively on Volvo's D13 engine. The answer to what's causing the repeated engine failures can be ascertained simply by viewing the timeline of OTSI repair invoices. Volvo is clearly aware of the issue. Volvo sold OTSI Volvo trucks with defective D13 engines at the time it knew of the engine defects and had designed a common rail fuel system to address this major D13 engine defect. Tom Krug, Christina Ameigh and Ken Nye were all aware of it when selling 23 Volvo trucks to OTSI.

63.     The failure cause is injector/s injecting excessive diesel fuel, requiring pistons to work at higher temperatures and pressures then the chamber is able to withstand.

64.    Higher pressure/temperatures expedite deterioration of the sealant sealing the injector cups. Once the seal has deteriorated, coolant leaks into the combustion chamber causing pressure to increase even more while building up around exhaust valves from the coolant and combustion particles mixing.

65.    In this high pressure/temperature environment, coolant builds up around the exhaust valves causing the valves to drop or fracture. As seen by OTSI's repairs, the weakest parts fail first, including the reservoir cap, reservoir tank, top or bottom hoses, clamps or the radiator.

66.    Valve stems bend or fracture due to the integrity of the metal deteriorating due to excessive heat and pressure in the piston chamber. OTSI was provided pictures for many of the repairs that clearly portray this failure mechanism. OTSI has photos for Units 4048, 4058, 6000, and 572 images. Invoices for other repairs demonstrate the same failure mechanism.

67.    When exhaust valve stems fracture and fall into the piston chamber, the engine experiences misfires and banging. The fractured stem piece would be broken/hammered by the piston against the top of the chamber and the exhaust valves.  The fractured piece of stem would then be broken into smaller pieces and sent through the EGR cooler, turbo and DPF filter, depending on the size of the fragments, causing additional damage.

68.    Stem fragments also damage piston liners causing a crack and coolant to escape into the engine oil, shutting down the truck.

69.    Kirik has purchased over 150 trucks in his 17-year trucking career from Freightliner, Kenworth and Volvo. OTSI's fleet has not significantly changed its operations. In 2015 OTSI was convinced to purchase its first batch of Volvo D13 engines with I-shift transmissions from Buffalo Truck Center. OTSI was promised greater fuel efficiency, and a reliable state-of-the-art Uptime Center to assist with any problems.

70.     OTSI purchased 2 Volvo 670 trucks with Volvo D16 engines from Burr Truck Sales in Vestal, NY in 2007, and experienced injector issues and injector wiring problems that were repaired by Volvo's authorized dealers on numerous occasions. OTSI was not happy with the performance of the D16 engines and decided to trade the trucks in 2009 for Volvo trucks with Cummins ISX engines. With these D13 engines, the experience was overwhelming and catastrophic with repetitive engine failures. OTSI was required to pay extensive towing bills, lodging expenses for drivers, flights for drivers and experienced loss of revenue. Out of 23 trucks, 20 trucks had repairs done to injector or injector's cups. 11 trucks had valves drop or fracture causing very expensive repairs, which are continuing.

71.     The other three trucks were warrantied and the authorized dealer did not provide repair invoices for the work performed. Unit 6002 was involved in an accident on 11/02/2017 it had 350k miles on it and it was deemed a loss. Out of 11 major repairs, Volvo provided coverage for one engine replacement for unit 4046. All other repairs were paid by OTSI with Volvo contributing roughly 8% as goodwill policy.  Other than engine problems, 10 of 23 trucks had transmission replaced.

72.     Plaintiff was forced to sell all of its Volvo trucks with this engine at a loss due to the known defect. Plaintiff sold the vehicles after giving Defendant the opportunity to inspect them.

73.     Plaintiff sold 18 units in June 2018 to AmeriQuest, a used truck wholesaler, for $55,000 per unit, for a total of $990,000. Plaintiff was forced to pay the remaining balance of these units ($402,872.94) to Bank of America, the holder of the note on the vehicles.

74.     Unit Number 4052 was sold for $41,265 to Copart. Unit Number 6004 was sold to  $50,000 Daniel Jurge.

75.     The fair market value of the trucks at the time Plaintiff sold them would have over $80,000 but for the engine defect.

76.     Accordingly, the defect caused a loss to Plaintiff of more than $25,000 per vehicle.

## VII.     CAUSES OF ACTION

### COUNT 1:  Breach of Express Warranty

77.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

78.     Defendant expressly warranted that the trucks were of high quality and, at a minimum, would actually work properly.

79.     Defendant also provides a Standard Volvo Engine Warranty that warrants Volvo engines to be free from defects in material and workmanship under normal use and service up to specified time and mileage limits, provided Volvo's maintenance requirements are followed.

80.     Volvo provides extended coverage plans to provide coverage for engine failures that occur after the Standard Volvo Engine Warranty has expired.

81.     Volvo's warranty requires Volvo to repair or replace defective parts when vehicles are brought to authorized Volvo truck dealers.

82.     Defendant breached this warranty by selling Plaintiff trucks with the known Engine Defect, making them of low quality and causing them to fail prematurely and/or fail to function properly.

83.     Defendant further breached this warranty by failing to repair and/or replace Plaintiff's engines when the engines failed during the applicable warranty periods.

84.     Plaintiff repeatedly brought its vehicles to authorized Volvo mechanics, in compliance with its warranty obligations, and the Volvo mechanics (who were obligated to carry

out Volvo's warranty obligations) repeatedly failed to satisfy Volvo's obligations by failing to make adequate and timely repairs.

85.     Volvo knew of the Engine Defect soon after trucks including the Engine Defect began to be sold, as evidenced by the huge number of vehicles being brought to Volvo dealerships for repair, and the huge number of repeat visits from truck owners evidencing that Volvo's standard repair procedures were not adequately repairing the Engine Defect.

86.      Despite Volvo's knowledge, Volvo continues to breach its express warranty, and has intentionally failed to notify Plaintiff of the Engine Defect.

87.     This intended failure to disclose known defect(s) is malicious, and was carried out with willful and wanton disregard for the rights and economic interests of Plaintiff.

88.     As a result of the Defendant's actions, Plaintiff has suffered economic damages including but not limited to costly repairs, loss of vehicle use, substantial loss in value and resale value of trucks, and other related damage.

89.     Defendant's breach of this warranty caused damages to Plaintiff.

90.     Defendant's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because they knowingly sold a defective product without informing purchasers about the defect.

91.     The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff. Among other things, Plaintiff had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Volvo and Plaintiff, and Volvo knew or should have known that the trucks were defective at the time of sale and would fail well before their useful lives.

92.     Plaintiff has complied with all obligations under the warranty, or otherwise has been excused from performance of said obligations as a result of Defendant's conduct described herein.

### COUNT 2:  Breach of The Implied Warranty of Merchantability

93.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

94.     Defendant Volvo is a "merchant" as defined under the Uniform Commercial Code ("UCC").

95.     The trucks are "goods" as defined under the UCC.

96.     Defendant impliedly warranted that the trucks were of a merchantable quality.

97.     Defendant breached the implied warranty of merchantability, as the trucks were not of a merchantable quality due to the Engine Defect.

98.     As a direct and proximate result of the breach of said warranties, Plaintiff was injured, and is entitled to damages.

99.     Defendant's attempt to disclaim or limit the implied warranty of merchantability is unconscionable and unenforceable here. Specifically, Defendant's warranty limitation is unenforceable because they knowingly sold a defective product without informing purchasers about the defect.

100.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff. Among other things, Plaintiff had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Volvo and Plaintiff, and Volvo knew or should have known that the trucks were defective at the time of sale and that the engines would fail well before their useful lives.

101.    Plaintiff has complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

### COUNT 3:  Common Law Fraud

102.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

103.    Defendant made material misrepresentations and omissions concerning a presently existing or past fact. For example, Defendant did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the engines, which was not readily discoverable until years later, often after the warranty had expired. As a result, Plaintiff was fraudulently induced to lease and/or purchase the trucks with the said design defects and all of the resultant problems.

104.    Defendant made these omissions and statements with knowledge of their falsity, and with the intent that Plaintiff rely on them.

105.    Plaintiff reasonably relied on these statements and omissions, and suffered damages as a result.

### COUNT 4:  Breach of The Duty of Good Faith and Fair Dealing

106.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

107.    Every contract contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

108.    Defendant breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiff of the engine defect in the trucks, and failing to fully and properly

repair this defect.

109.    Defendant acted in bad faith and/or with a malicious motive to deny Plaintiff some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

**COUNT 5:  Violation of the New York General Business Law Section 349, et seq.**

110.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

111.    Defendant's practices, acts, policies, and course of conduct, including its omissions, as described above, were intended to induce, and did induce, Plaintiff and other members of the public to purchase the above-mentioned trucks with the Engine Defects.

112.    Defendant sold and/or leased the trucks knowingly concealing that they contained the Engine Defects alleged.

113.    Defendant's acts are and were deceptive acts or practices which are and/or were, likely to mislead a reasonable consumer purchasing the trucks.

114.    Defendant's aforementioned deceptive acts and practices are material, in part, because they concern an essential facet of the trucks' functionality and safety. The sale and distribution of the trucks, as well as the deceptive acts described above, in New York were consumer-oriented acts and thereby fall under the New York deceptive acts and practices statute, General Business Law Section 349. They were consumer-oriented, because these trucks with the Engine Defects, and acts and omissions related to these trucks and improper repair of the trucks, were committed generally to all purchasers of these trucks, and not just to Plaintiff.

115.    Defendant's practices, acts, policies and course of conduct violated New York's General Business Law Section 349 Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, et seq., as follows:

116.   At the time of sale, Defendant knowingly misrepresented and intentionally omitted and concealed material information regarding the trucks by failing to disclose to Plaintiff, and other New York purchasers the known Engine Defects and the known risks associated therewith.

117.   Thereafter, Defendant failed to disclose the defects to Plaintiff, and other truck owners in New York, either through warnings or recall notices, and/or actively concealed from them the fact that the trucks' engines were defective, despite the fact that Defendant knew of such defects: (1) at the time of manufacturing, when it manufactured the defective engines; and (2) at the point where Defendant's customers began registering complaints to Defendant and Defendant's authorized dealers.

118.   Defendant forced Plaintiff and other New York customers to expend sums of money at its dealerships to authorized repair facilities to repair and/or replace the defective engines, despite the fact that Defendant had prior knowledge of the defects at the time of purchase.

119.   Defendant also engaged in materially misleading deceptive acts and practices by advertising and selling a limited warranty while knowing that significant portions of the damages resulting from the known, but concealed, Engine Defects would not be revealed to the consumer until after coverage expired thereunder and that many of the truck engines would fail prematurely, but outside the warranty period.

120.   Additionally, Defendant, in administering the limited warranty, engaged in materially misleading deceptive acts and practices by performing repairs on the truck engines with equally defective parts, and/or replacing defective engines with equally defective engines, and refusing to properly repair the Engine Defects.

121.    Defendant engaged in materially misleading and deceptive acts by continuing to sell the trucks with defective engines to the consuming public and to represent that these trucks were in good working order, merchantable, and not defective, despite Defendant's knowledge that the vehicles would not perform as intended, represented, and warranted and that the above described Engine Defect would cause purchasers to incur significant out-of-pocket costs and expenses.

122.    The aforementioned conduct is and was deceptive and false and constitutes an unconscionable, unfair, and deceptive act or practice in that Defendant has, through knowing, intentional, and material omissions, concealed the true, defective nature of the truck engines to Plaintiff and to other consumers.

123.    By making these misrepresentations of fact and/or material omissions to prospective customers while knowing such representations to be false, Defendant has misrepresented and/or knowingly and intentionally concealed material facts and breached its duty not to do so, to Plaintiff and other consumers.

124.    Plaintiff and members of the public were deceived by Defendant's failure to disclose and could not discover the defect themselves before suffering their injuries.

125.    As a direct and proximate result of these unconscionable, unfair, and deceptive acts or practices Plaintiff has been damaged as alleged herein, and is entitled to recover actual damages to the extent permitted by law, including in inflated price injury, repair and replacement costs, and/or statutory damages, in an amount to be proven at trial.

126.    Plaintiff seeks restitution of the substantial sums of money it expended to repair and replace its truck engines as a result of the defect, which Defendant knew about prior to the sale of the trucks.

127.     Plaintiff also seeks appropriate equitable relief, including an order requiring Defendant to adequately disclose and remediate the Engine Defect and an order enjoining Defendant from incorporating the defective engines into its vehicles in the future.

## VIII.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court:

a.     award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff is entitled;

b.     award pre-judgment and post-judgment interest on such monetary relief;

c.     grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the engines in the trucks and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff with appropriate curative notice regarding the existence and cause of the Engine Defect;

d.     award reasonable attorney's fees and costs; and

e.     grant such further relief that this Court deems appropriate.

Dated: April 18, 2019

                                    Respectfully submitted,

                                    Cory S. Fein (Pro Hac Vice to be filed)
                                    CORY FEIN LAW FIRM
                                         *Counsel for Plaintiff*
                                    712 Main St., #800
                                    Houston, TX 77002
                                    Telephone: (281) 254-7717
                                    Facsimile: (530) 748-0601
                                    E-mail: cory@coryfeinlaw.com


                                    *s / David Rothenberg*

                                    David Rothenberg, Esq.
                                    ROTHENBERG LAW
                                         *Local Counsel for Plaintiff*

- 29 -

45 Exchange Street, Suite 800
Rochester, New York 14614
Tel:  (585) 232-1946
Fax:  (585) 232-4746
Email:  david@rothenberglawyers.com

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ORANGE TRANSPORTATION SERVICES, INC., | Case No. _____ |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| VOLVO GROUP NORTH AMERICA, LLC, | |
| Defendant. | |

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff herby demands a trial by jury of the within action.

Dated: April 18, 2019

Respectfully submitted,

Cory S. Fein (Pro Hac Vice to be filed)
CORY FEIN LAW FIRM
 *Counsel for Plaintiff*
712 Main St., #800
Houston, TX 77002
Telephone: (281) 254-7717
Facsimile: (530) 748-0601
E-mail: cory@coryfeinlaw.com


*s / David Rothenberg*

David Rothenberg, Esq.
ROTHENBERG LAW
 *Local Counsel for Plaintiff*
45 Exchange Street, Suite 800
Rochester, New York 14614
Tel:  (585) 232-1946
Fax:  (585) 232-4746
Email:  david@rothenberglawyers.com